UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OFIR HANAN, et al.,

                    Plaintiffs,

          v.

U.S. CITIZENSHIP AND IMMIGRATION
SERVICES (USCIS), et al.,

                    Defendants.

Case No. 23-cv-02414-HSG

**ORDER DENYING PLAINTIFFS'
MOTION FOR SUMMARY
JUDGMENT AND GRANTING
GOVERNMENT'S CROSS-MOTION
FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 22, 24

Pending before the Court are cross-motions for summary judgment.  Dkt. Nos. 22, 24.  The Court finds these matters appropriate for disposition without oral argument and the matters are deemed submitted.  *See* Civil L.R. 7-1(b).  For the reasons detailed below, the Court **DENIES** Plaintiffs' motion for summary judgment and **GRANTS** Defendants' cross-motion.

I.    **BACKGROUND**

      A.    **Factual Background**

      Plaintiffs Ofir Hanan and Melanie Gillum seek judicial review of the decisions of the Board of Immigration Appeals ("BIA") and the United States Citizenship and Immigration Services ("USCIS") denying Plaintiff Gillum's I-130 petition to classify Plaintiff Hanan as the immediate relative spouse of a United States citizen.  *See* Dkt. No. 1 ("Compl.").  Hanan is a citizen of Israel, and entered the United States on a B-2 nonimmigrant visa in April 2008.  *See* Dkt. No. 19-4 ("CAR2") at 340–41, 348–350.[1]  He has been married to two U.S. citizens.  He married Margarita Jaimes on May 15, 2010, and they divorced on February 14, 2012.  *See* Dkt.

_____

[1] The Certified Administrative Record ("CAR") is in two parts, and located at Dkt. No. 19-3 and Dkt. No. 19-4, Ex. A.  The Court refers to the CAR's internal pagination unless otherwise specified.

United States District Court
Northern District of California

No. 19-3 ("CAR1") at 145; CAR2 at 347.  Hanan never sought any immigration benefits based on his marriage to Jaimes.  *See id.*  He married Plaintiff Gillum on January 4, 2014.  CAR1 at 144.

In September 2014, Plaintiff Gillum filed a Form I-130, Petition for Alien Relative, on Hanan's behalf, and Hanan correspondingly filed a Form I-485, Application to Register Permanent Residence or Adjust Status.  *Id.* at 139–40; CAR2 at 340–45.  As part of the review of Plaintiffs' I-130 and I-485, USCIS immigration officers interviewed Plaintiff Hanan's ex-wife Jaimes in November 2016.  *See* CAR1 at 128–31.  Jaimes provided a written sworn statement in which she stated that she agreed to marry Hanan in exchange for money.  *Id.* at 129.  Specifically, she explained that while she was working at Little Caesars she was approached by someone who asked how much money she made in that job.  *Id.*  She said she made "enough," but struck up a friendship with him.  *Id.*  He later asked her if she would marry his cousin, Hanan, "for some extra cash."  *Id.*  She said that she "took the deal," and was paid approximately $1,500 to $2,000 the day of their wedding, and $500 a month for approximately nine months.  *Id.*  Jaimes said that they never lived together.  *Id.*  Hanan eventually asked her to move with him to San Francisco, but she said that she "didn't want[] to move" and "didn't want to help him anymore," so they filed for divorce.  *Id.*  Jaimes stated that "[t]he whole purpose" of their arrangement "was for him to get his papers and for [her] to get extra cash."  *Id.*

In March 2017, Plaintiffs appeared for an interview with USCIS.  CAR2 at 132–38.  When confronted with Jaimes's statement, Hanan explained that he met Jaimes through friends and he intended to start a life with her.  *See* CAR2 at 125–27.  According to Hanan, however, they were "very young" when they got married—Jaimes was only 19—and she was "very emotional and yelled a lot" and "abused alcohol even though she was underage."  *Id.* at 125–26.  Hanan said he did not pay her money to marry him, although he did give her money at times, and she in fact demanded it from him, including during their divorce process.  *Id.* at 126–27.  Hanan suggested that Jaimes offered her statement because she was "probably angry about the divorce."  *Id.* at 127.

USCIS issued three Notices of Intent to Deny ("NOID") the I-130 petition, and provided Plaintiffs an opportunity to respond to each.

In June 2017, USCIS issued the first NOID, finding that there was substantial and

2

probative evidence that Hanan had attempted or conspired to enter into a marriage with Jaimes for the purpose of evading immigration laws. CAR1 at 121–24. The NOID cited Jaimes's statement, and explained that Hanan's response was "unpersuasive" and did not meaningfully rebut Jaimes's statement. *Id.* at 123–29. In response to the NOID, Plaintiffs submitted 16 photographs of Hanan and Jaimes, as well as three short declarations from Hanan's father, friend, and uncle. *Id.* at 110–20. Hanan's father stated that he and his daughter visited Hanan and Jaimes once a few months after their wedding, and that "[i]t was my feeling at the time that Ofir and Margarita were trying to build a life together." *Id.* at 113. Hanan's friend, who was present at the wedding, similarly stated that "[f]rom my observation of the wedding and the relationship, I believed and understood that Margarita and Ofir were trying to start a life together." *Id.* at 119. Hanan's uncle also stated that he was not present at the wedding but Hanan and Jaimes visited them on their honeymoon and they "were looking very happy together" and that the "relationship [was] moving to right direction [*sic*]." *Id.* at 116. None of them offered any detail to explain their impressions about the relationship.

During their ongoing investigation, USCIS identified a July 2011 investigation report from the California Department of Justice, Bureau of Gambling Control ("BGC"), in which Hanan made statements about his marriage to Jaimes. *See id.* at 97–98. Hanan was interviewed by the BGC as part of an unrelated investigation regarding illegal slot machines in the Bay Area. *Id.* During the interview, Hanan described to the agents how a third party involved in the slot machine scheme arranged for him "to marry a U.S. citizen in order to get a green card." *Id.* According to the report, Hanan told the agents that this third party "found James [*sic*] and that he paid her to marry him." *Id.* Hanan also said that he was "told to pay James [*sic*] $250.00 every month until he received his green card." *Id.* at 98. He paid her by depositing money "directly into James [*sic*] bank account." *Id.* The third party also sent him to an immigration attorney to help him with his paperwork. *Id.* USCIS issued a second NOID in July 2020, citing both Jaimes's sworn statement and excerpts of this BGC report. *Id.* at 92–98.

In response, Plaintiffs requested that USCIS produce the entire BGC report for their review. *See id.* at 85, 88. Hanan also submitted another statement in which he reiterated that he

"never paid Margarita Jaimes any amount of money to marry me." *Id.* at 90.  He repeated that he married her "with the intention to build a life together." *Id.*  Hanan also said that he "was attracted to her" and "thought [they] could make a go of it." *Id.*  He acknowledged that he consulted with an immigration attorney, but said he and Jaimes "discussed [his] immigration status as any couple does when one of them is not [a] U.S. citizen." *Id.*

USCIS issued a third NOID in February 2021, attaching the BGC report.  *Id.* at 62–83.  Parts of the report, including the names of the BGC agents and the alleged co-conspirators in the illegal slot machine ring, were redacted by BGC.  *See id.* at 68–79.  USCIS said that it "ha[d] not relied on any evidence that is redacted in determining that the beneficiary engaged in marriage fraud."  *Id.* at 66.  In response, Plaintiffs offered legal arguments that, as they acknowledged, "largely reiterate[d] the arguments that they [] repeatedly put forth . . . ." *Id.* at 55.  Plaintiffs argued that Hanan had a due process right to cross-examine Jaimes.  *Id.* at 56.  They further argued that the redacted BGC report made it impossible for them to identify and speak with the officers and other individuals named in the report.  *Id.* at 58.

USCIS ultimately denied the I-130 visa petition in March 2022.  *See id.* at 48–54.  USCIS explained that Plaintiffs had failed to provide credible and persuasive evidence that Hanan's marriage to Jaimes was bona fide, given Jaimes's sworn statement and Hanan's statements in the BGC interview.  *Id.*  Because it denied the visa petition, USCIS also denied Hanan's I-485 adjustment of status application that same day.  *See* CAR2 at 325–26.  Plaintiffs appealed the denial of the I-130 petition to the BIA.  *See* CAR1 at 8–9.  The BIA adopted and affirmed the USCIS decision.  *See id.* at 2–4.

### B.    Statutory Framework

A United States citizen may file an I-130 petition with USCIS to obtain lawful permanent resident status for her noncitizen spouse, the "beneficiary" of the petition.  *See* 8 U.S.C. § 1154(a)(1)(A)(i).  If USCIS grants an I-130 petition, then the beneficiary is classified as an "immediate relative" who may seek adjustment of status to permanent residence by filing an I-485 application.  *See* 8 U.S.C. §§ 1151(b)(2)(A)(i).  The Ninth Circuit has explained that the "grant of an I-130 petition for immediate relative status is a nondiscretionary decision." *Ching v. Mayorkas*,

4

725 F.3d 1149, 1156 (9th Cir. 2013).  "Immediate relative status for an alien spouse is a right to which citizen applicants are entitled as long as the petitioner and spouse beneficiary meet the statutory and regulatory requirements for eligibility."  *Id.*

"One bar to the grant of an I-130 petition is the so-called 'marriage fraud bar,' which prohibits the grant of a petition if 'the alien has previously been accorded, or has sought to be accorded, an immediate relative or preference status as the spouse of a citizen of the United States . . . by reason of a marriage determined by the [Director of the Bureau of Citizenship and Immigration Services] to have been entered into for the purpose of evading the immigration laws.'"  *Yocom v. United States Citizenship & Immigr. Servs.*, No. 23-55430, 2024 WL 2206342, at *2 (9th Cir. May 16, 2024) (quoting 8 U.S.C. § 1154(c)).  To apply this bar, the government must "provide 'substantial and probative evidence' of marriage fraud."  *Id.* (quoting 8 C.F.R. § 204.2(a)(1)(ii)); *see also Zerezghi v. USCIS*, 955 F.3d 802, 805 (9th Cir. 2020).  The "substantial-and-probative-evidence standard is a standard of proof, which is at least as high as a preponderance of the evidence."  *Zerezghi*, 955 F.3d at 816.  "The burden then shifts to the petitioner to rebut that finding."  *Id.*

### C.  Procedural History

Plaintiffs filed a complaint in May 2023, claiming that in denying the I-130 petition Defendants acted arbitrarily and capriciously in violation of the Administrative Procedure Act ("APA") and the Due Process Clause of the U.S. Constitution.  Dkt. No. 1.  Plaintiffs argued that Defendants improperly applied the marriage fraud bar, 8 U.S.C. § 1154(c)(2), and that their due process rights were violated because Jaimes was not made available for cross-examination in an evidentiary hearing.  *See id.* at ¶¶ 58–67.  As such, they urge that the denial of the I-130 visa petition was not supported by substantial and probative evidence that Hanan and Jaimes had entered into a fraudulent marriage.  *See id.* at ¶¶ 68–74.  They also argue that the corresponding denial of the I-485 application was similarly erroneous and in violation of the APA.  *See id.* at ¶¶ 75–79.

The parties filed cross-motions for summary judgment.  *See* Dkt. No. 22, 24.  In the months since the parties filed their motions, the Supreme Court decided two landmark cases that

are relevant to the resolution of the cross-motions:  *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024) and *Department of State v. Muñoz*, 144 S. Ct. 1812 (2024).  The Court gave the parties an opportunity to file supplemental briefs addressing the impact of *Loper Bright* and *Muñoz* on the issues raised in the cross-motions for summary judgment.  Dkt. Nos. 32, 33.

## II.    LEGAL STANDARD

Summary judgment is proper when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a dispute is "genuine" if there is evidence in the record sufficient for a reasonable trier of fact to decide in favor of the nonmoving party.  *Id.* But in deciding if a dispute is genuine, the court must view the inferences reasonably drawn from the materials in the record in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986), and "may not weigh the evidence or make credibility determinations," *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997), *overruled on other grounds by Shakur v. Schriro*, 514 F.3d 878, 884–85 (9th Cir. 2008).  If a court finds that there is no genuine dispute of material fact as to only a single claim or defense or as to part of a claim or defense, it may enter partial summary judgment.  Fed. R. Civ. P. 56(a).

Summary judgment is the appropriate mechanism to review agency determinations under the APA because the Court's review is limited to the administrative record and it is not resolving questions of disputed fact.  *See Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471–72 (9th Cir. 1994).  Under the APA, the Court "must set aside the BIA's decision if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  *Zerezghi*, 955 F.3d at 807 (quoting 5 U.S.C. § 706(2)(A)).  The Court reviews the agency's legal determinations de novo and its factual findings for substantial evidence.  *See Meza-Vallejos v. Holder*, 669 F.3d 920, 924 (9th Cir. 2012); *Zerezghi*, 955 F.3d at 814–15.

## III.    DISCUSSION

### A.    Meaning of § 1154(c)(2)

As an initial matter, the parties dispute whether the marriage fraud bar, 8 U.S.C.

United States District Court
Northern District of California

§ 1154(c)(2), applies here at all. Plaintiffs contend that § 1154(c) is inapplicable because Hanan did not seek immigration benefits based on his prior marriage to Jaimes. *See* Dkt. No. 22 at 7–10. Defendants, on the other hand, argue that the statute applies even if a noncitizen only "attempted" or "conspired" to enter a marriage for the purpose of evading the immigration laws, whether or not he ultimately sought immigration benefits. *See* Dkt. No. 24 at 8–12 (citing 8 U.S.C. § 1154(c)(2)). In short, the parties disagree about the meaning of the marriage fraud bar.

In the Supreme Court's recent opinion, *Loper Bright v. Raimondo*, the Court overruled *Chevron U. S. A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *See Loper Bright*, 144 S. Ct. at 2254–73. The parties agree that in light of *Loper Bright*, the BIA's interpretation of § 1154(c) is not entitled to deference under *Chevron*. *See* Dkt. No. 32 at 1–2; Dkt. No. 33 at 1–2. Although the Court may consider an agency's interpretation as "guidance," it may not defer to the agency. *See Loper Bright*, 144 S. Ct. at 2262 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). Instead, the Court "must exercise independent judgment in determining the meaning of statutory provisions." *Id.* It "need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous." *Id.* The Court therefore conducts its own independent analysis of the meaning of § 1154(c)(2).

As with all questions of statutory interpretation, the Court begins with the plain language of the statute. *See Cheneau v. Garland*, 997 F.3d 916, 919–20 (9th Cir. 2021) (en banc) (quoting *Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009)). The Court "read[s] the words 'in their context and with a view to their place in the overall statutory scheme.'" *Cheneau*, 997 F.3d at 919 (quoting *King v. Burwell*, 576 U.S. 473, 486 (2015)). The Court may also consider "'other traditional aids of statutory interpretation' in order to ascertain congressional intent." *Id.* at 920 (quoting *Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 13 (1981)). "The plain meaning of the statute controls, and courts will look no further, unless its application leads to unreasonable or impracticable results." *Robinson v. United States*, 586 F.3d 683, 687 (9th Cir. 2009) (quotation omitted).

Section 1154(c) provides that no I-130 petition shall be approved if:

(1) the alien has previously been accorded, or has sought to be accorded, an immediate relative or preference status as the spouse of a citizen of the United States or the spouse of an alien lawfully admitted for permanent residence, by reason of a marriage determined by the Attorney General to have been entered into for the purpose of evading the immigration laws, or

(2) the Attorney General has determined that the alien has attempted or conspired to enter into a marriage for the purpose of evading the immigration laws.

8 U.S.C. § 1154(c)(1)–(2).

Section 1154(c)(1) expressly bans noncitizens who have "previously been accorded" or who have "sought to be accorded" immigration benefits based on a fraudulent marriage. By its terms, § 1154(c)(1) thus only applies where a noncitizen "entered into" a marriage and "sought" an immigration benefit based on that marriage (whether or not any benefit was actually obtained). *See Zerezghi*, 955 F.3d at 804–05 ("The [marriage fraud bar] applies regardless of whether the past sham marriage resulted in a successful immigration petition."). Section 1154(c)(2), in contrast, does not explicitly require a noncitizen to have sought any immigration benefit based on a fraudulent marriage before the ban applies. Rather, the ban applies as long as the noncitizen "attempted or conspired to enter into a marriage for the purpose of evading the immigration laws." 8 U.S.C. § 1154(c)(2). As one judge has explained, under § 1154(c)(2) "[i]t does not matter whether [a noncitizen] used the marriage to obtain a visa . . . . It is enough that he married—or even just attempted or conspired to marry—with the forbidden purpose." *Ghaly v. I.N.S.*, 48 F.3d 1426, 1436 (7th Cir. 1995) (Posner, J., concurring).

Plaintiffs suggest that the Court should incorporate a requirement that immigration benefits must have been sought into (c)(2) as well. *See* Dkt. No. 22 at 7–10. As will be discussed further below, Plaintiffs contend that Congress created § 1154(c)(2) solely to "close the 'fiancé loophole' where noncitizens would petition for fiancés from abroad and bring them to the United States, and then after they arrived here would separate without every marrying." *See* Dkt. No. 22 at 1. In such circumstances, the noncitizen actually received an immigration benefit in the form of a K-1 visa. Setting aside the legislative history for now, (c)(2) says nothing about fiancés or K-1 visas specifically, or about seeking or being accorded an immigration benefit of any kind. Congress

1    clearly chose to structure (c)(1) and (c)(2) differently, and the Court has no reason to believe that it

2    did so inadvertently.  To the contrary, the Ninth Circuit has cautioned that "[w]here Congress

3    includes particular language in one section of a statute but omits it in another section of the same

4    Act, it is generally presumed that Congress acts intentionally and purposely in the disparate

5    inclusion or exclusion."  *Cheneau*, 997 F.3d at 920 (quoting *I.N.S. v. Cardoza-Fonseca*, 480 U.S.

6    421, 432 (1987)).

7         This presumption seems particularly apt where, as here, Congress amended (c)(1) and

8    created (c)(2) at the same time.  *See* Immigration Marriage Fraud Amendments of 1986 ("IMFA"),

9    Pub. L. No. 99-639, 100 Stat. 3537, 3543 (1986).  Had Congress intended *both* (c)(1) and (c)(2) to

10   require a noncitizen to seek immigration benefits, it could have drafted each section accordingly.

11   *See Lopez v. Garland*, -- F.4th--, No. 23-870, 2024 WL 4140626, at *8 (9th Cir. Sept. 11, 2024)

12   ("As the Supreme Court observed long ago, '[w]hen the language is plain, we have no right to

13   insert words and phrases, so as to incorporate in the statute a new and distinct provision.'")

14   (quoting *United States v. Temple*, 105 U.S. 97, 99 (1881)).  Plaintiffs' interpretation would require

15   the Court to ignore the plain language of § 1154(c) and essentially rewrite the statute.

16        Plaintiffs respond that such a rewrite is nevertheless appropriate because if (c)(2) applies

17   where the noncitizen never sought immigration benefits, this would render (c)(1) superfluous.  *See*

18   Dkt. No. 26 at 2; *see also* Dkt. No. 32 at 2–3 (expanding this argument in their supplemental brief

19   about the implication of *Loper Bright*).  Plaintiffs contend that "[i]f § 1154(c)(2) applies where

20   there is no marriage *and* no immigration benefit sought, then § 1154(c)(1) has no meaning at all."

21   Dkt. No. 26 at 2 (emphasis in original).  In their view, "an attempt or conspiracy 'to enter into a

22   marriage for the purpose of evading the immigration laws' would subsume every act listed in

23   subsection (c)(1)."  Dkt. No. 32 at 2.  Although Plaintiffs do not flesh out this argument further,

24   the Court assumes that Plaintiffs are concerned, at least in part, that anyone who actually entered

25   into a marriage for the purpose of evading the immigration laws also necessarily conspired to do

26   so.  However, this overlap would exist whether or not the Court assumes that (c)(2) requires a

27   noncitizen to seek immigration benefits.  Plaintiffs' suggestion that both (c)(1) and (c)(2) require

28   that the noncitizen actually seek immigration benefits simply compounds this problem further.

United States District Court
Northern District of California

United States District Court
Northern District of California

1       In any event, the Court agrees with Defendants that if Congress had only intended to

2   expand the marriage fraud bar to cover the "fiancé loophole," it could have done so far more

3   straightforwardly.  *See* Dkt. No. 24 at 11.  There would have been no reason to add a second

4   clause at all.  Instead, Congress could have extended the prior statute to cover engaged, as well as

5   married couples, by providing that:  "[N]o petition shall be approved if the [noncitizen] has

6   previously been accorded, or has sought to be accorded, an immediate relative preference status *or*

7   *nonimmigrant visa* as the spouse *or fiancé* of a citizen of the United States or the spouse of a[]

8   [noncitizen] lawfully admitted for permanent residence, by reason of a marriage or engagement

9   determined by the Attorney General to have been entered into for the purpose of evading the

10  immigration laws."

11      Defendants also point out that even as currently drafted, (c)(1) is not entirely subsumed by

12  (c)(2).  *See* Dkt. No. 27 at 2–3.  Section 1154(c)(1) does not require that the U.S. citizen and

13  noncitizen *conspired* or *agreed* to enter into a fraudulent marriage.  It is therefore possible that

14  under (c)(1) only a noncitizen—and not their spouse—could enter into a marriage for the purpose

15  of evading the immigration laws.  *See* Dkt. No. 27 at 2–3; *cf. Matter of R. I. Ortega*, 28 I&N Dec.

16  9, 13 (BIA 2020) (holding that a conspiracy under § 1154(c)(2) requires "an agreement to enter

17  into a marriage for the purpose of evading the immigration laws and an overt act in furtherance of

18  that agreement"); *Bark v. Immigr. & Naturalization Serv.*, 511 F.2d 1200, 1201 (9th Cir. 1975)

19  (defining a sham marriage as one in which "the bride and groom did not intend to establish a life

20  together at the time they were married").  The Ninth Circuit has explained that "marriage fraud

21  may be committed by one party to the marriage, or a person who arranged the marriage, yet the

22  other spouse may genuinely intend to marry."  *United States v. Orellana-Blanco*, 294 F.3d 1143,

23  1151 (9th Cir. 2002) (quotation omitted).

24      And ultimately, the Court does not need to find an interpretation of the statute that

25  eliminates all overlap between (c)(1) and (c)(2).  As the Ninth Circuit has explained, "canons of

26  statutory interpretation are not absolute and can be 'overcome by other indicia of meaning.'"

27  *United States v. Paulson*, 68 F.4th 528, 539 (9th Cir. 2023) (quoting *Lockhart v. United States*,

28  577 U.S. 347, 352 (2016)).  The canon against surplusage, although important, does not justify

completely rewriting the statute. *Cf. In re Pangang Grp. Co., LTD.*, 901 F.3d 1046, 1056 (9th Cir. 2018) ("[W]e disfavor efforts to use canons of construction to introduce ambiguity into straightforward text.").  "The first and most important canon of statutory construction is the presumption that a legislature says in a statute what it means and means in a statute what it says there." *Id.* (quotation omitted).  "[R]edundancies are common in statutory drafting—sometimes in a congressional effort to be doubly sure, sometimes because of congressional inadvertence or lack of foresight, or sometimes simply because of the shortcomings of human communication." *Pugin v. Garland*, 599 U.S. 600, 609 (2023) (quoting *Barton v. Barr*, 590 U.S. 222, 239 (2020)).  The Supreme Court "has often recognized" that "[s]ometimes the better overall reading of the statute contains some redundancy." *Barton*, 590 U.S. at 239 (quotation omitted).  The Court finds that this is such a case.  A straightforward reading of the statute indicates that Congress intended to ban both those who sought an immigration benefit based on a fraudulent marriage and also those who only conspired to do so.  Because the Court finds that the statute is unambiguous on its face, the Court need not consider the legislative history. *See, e.g.*, *CVS Health Corp. v. Vividus, LLC*, 878 F.3d 703, 706 (9th Cir. 2017) ("If the language has a plain meaning or is unambiguous, the statutory interpretation inquiry ends there.").

And even had the Court found the statute to be ambiguous, the legislative history of § 1154(c) further supports the Court's interpretation that (c)(2) does not require a noncitizen to have sought any immigration benefit before the bar applies.  When first enacted, § 1154(c) only barred approval of a visa petition where the noncitizen had "previously been accorded a nonquota or preference status . . . by reason of a marriage determined by the Attorney General to have been entered into for the purpose of evading the immigration laws." *See* An Act to Amend the Immigration and Nationality Act, Pub. L. No. 89-236, 79 Stat. 911, 915 (1965) at § 4.  The bar therefore only applied if a noncitizen had obtained an immigration benefit based on a fraudulent marriage. *See, e.g.*, *Matter of Concepcion*, 16 I. & N. Dec. 10, 11 (BIA 1976) (concluding that prior bar did not apply where the petitioner was accorded immediate relative status on the basis of falsified documents and "[n]o marriage was entered into"); *Matter of Isber*, 20 I. & N. Dec. 676, 678 (BIA 1993) (explaining that prior bar had a "loophole" such that the bar did not apply if "the

11

petitioner withdrew the visa petition on being confronted with evidence that the marriage was a sham").

The House Report to the IMFA, which amended § 1154(c), stated that the purpose of the legislation was broadly "to deter immigration-related marriage fraud." H. Rep. No. 99–906, at *1 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5978, 5978. The House Report further explained the need for the legislation:

> Historically, U.S. immigration policy has recognized the importance of protecting nuclear families from separation by permitting immediate family members of U.S. citizens to immigrate to the United States without numerical limitation. Similarly, the law has long set aside a significant number of immigrant visas for immediate relatives of permanent resident aliens. Because of this special status accorded such alien relatives, *aliens who either cannot otherwise qualify for immigration to the United States or who, though qualified, are not willing to wait until an immigrant visa becomes available, frequently find it expedient to engage in a fraudulent marriage in order to side-step the immigration law.*

*Id.* at *6 (emphasis added). Section 1154(c), therefore, was intended to deter noncitizens from entering into a fraudulent marriage "in order to side-step" the immigration laws. More specifically, the House Report states that "the bill perpetually bars from immigrating to the United States any [noncitizen] who has conspired to engage in a fraudulent marriage or who has attempted to obtain an immigration benefit on the basis of such marriage." *Id.* at *6, *8. This broad purpose is similarly reflected in the title of § 4 to the IMFA, "Restrictions on Future Entry of [Noncitizens] *Involved with* Marriage Fraud." *See* IMFA at § 4 (emphasis added).

Plaintiffs point out that the Department of Justice, in supporting the enactment of the legislation, stated that the amendments would:

> D[o] away with the distinction between fiancés and other aliens whose benefits are based on marriage. Commonly, a fiancée who does marry the petitioning spouse will immediately terminate the marriage, remarry, and file a preference petition for another alien. This significant loophole must be closed, and the bill would do that.

*Id.* at *10. Plaintiffs do not explain how the Department of Justice's position on the legislation is relevant to *Congress's* intent when enacting the legislation. Moreover, that the IMFA eliminated

1   the so-called "fiancé loophole" does not suggest that this was the only—or even the primary—

2   purpose behind the changes to § 1154(c) so as to override the plain language of the statute.

3          Lastly, Plaintiffs argue that "[a]pplying § 1154(c)(2) to cases where no immigration benefit

4   was sought is unduly harsh . . . ." Dkt. No. 22 at 10.  Courts have recognized that the marriage

5   fraud bar is a "harsh penalty."  *See, e.g.*, *Zerezghi*, 955 F.3d at 813 (noting the "the harsh effects of

6   a marriage-fraud determination"); *Ghaly*, 48 F.3d at 1436 (Posner, J., concurring) ("This is a harsh

7   law . . . .").  Plaintiffs point out that Hanan was very young at the time of his first marriage to

8   Jaimes, and he now has a child with Gillum and faces permanent separation from his family as a

9   result of the BIA's decision.  *See* Dkt. No. 22 at 10–11.  But Plaintiffs do not cite—and the Court

10  is not aware of—any principle that would allow it to rewrite a statute because of the severity of its

11  consequences.  Congress, not the courts, makes these types of policy determinations.

12         **B.   Due Process**

13         Next, Plaintiffs argue that even if § 1154(c)(2) could apply here, their due process rights

14  were violated.  *See* Dkt. No. 22 at 11–14.  Both in their NOID responses and summary judgment

15  briefs, Plaintiffs urge that they were entitled to cross-examine Jaimes but were not given the

16  opportunity to do so.  *See id.*; *see also* Dkt. No. 26 at 7.

17         The Due Process Clause of the Fifth Amendment provides that no person shall "be

18  deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.  The

19  Ninth Circuit has explained that "[a] threshold requirement to a substantive or procedural due

20  process claim is the plaintiff's showing of a liberty or property interest protected by the

21  Constitution."  *Ching*, 725 F.3d at 1155 (quotation omitted).  "To have a property interest in a

22  benefit," a person must "have a legitimate claim of entitlement to it."  *Id.* (quotation omitted).

23  This is "determined largely by the language of the statute and the extent to which the entitlement

24  is couched in mandatory terms."  *Id.* (quotation omitted).

25         In *Ching*, the Ninth Circuit held that because the "grant of an I–130 petition for immediate

26  relative status is a nondiscretionary decision," it is a protected interest that "is entitled to the

27  protections of due process."  *Id.* at 1156 ("Immediate relative status for an alien spouse is a right to

28  which citizen applicants are entitled as long as the petitioner and spouse beneficiary meet the

United States District Court
Northern District of California

statutory and regulatory requirements for eligibility.").  The Ninth Circuit thus reversed a grant of summary judgment where the petitioners were not afforded the opportunity to cross-examine the noncitizen Teresita Ching's ex-husband or the USCIS officer who took the ex-husband's statement.  *Id.* at 1154–55.  USCIS based its marriage fraud determination solely on a six-sentence statement from the ex-husband, in which he said that he did not marry for love, was paid in cash installments, and never lived with or had sex with Ching.  *Id.* at 1153.  Ching, on the other hand, submitted a lengthy sworn declaration in which she described "in excruciating detail her intimate relationship" with her ex-husband.  *Id.*  She also corroborated the account of her relationship with "photographs of the couple, joint utility bills, an apartment lease, and a letter [her ex-husband] had previously written to USCIS stating that he and Ching 'truly loved each other.'"  *Id.*  The Ninth Circuit held that under such circumstances, "due process required a hearing with an opportunity for Ching to confront the witnesses against her."  *Id.* at 1159.

Plaintiffs urge that due process likewise required them to be given the opportunity to cross-examine Jaimes.  *See* Dkt. No. 22 at 11–13.  Plaintiffs appear to characterize *Ching* as categorically holding that due process *always* requires an opportunity to cross-examine witnesses when assessing I-130 petitions.  *Id.*  However, in *Ching*, the Ninth Circuit emphasized that "due process is flexible and calls for such procedural protections as the particular situation demands." *Ching*, 725 F.3d at 1157 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976)).  The Court noted that this is especially true in administrative proceedings, which require consideration of "the specific circumstances involved . . . on a case by case basis."  *Id.*

When determining whether additional process is due in any given case, the Court must consider the three *Mathews* factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 335.

### i. *Chenery* Doctrine

As an initial matter, Plaintiffs argue that this Court cannot consider *Ching* or evaluate the *Mathews* factors at all because the BIA did not explicitly do so.  *See* Dkt. No. 22 at 13; Dkt. No. 26 at 6–7.  Plaintiffs urge that Defendants are offering improper *post hoc* justifications.  *Id.* Plaintiffs cite *SEC v. Chenery Corporation*, in which the Supreme Court held that "a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency." 332 U.S. 194, 196 (1947); *accord Navas v. I.N.S.*, 217 F.3d 646, 658, & n.16 (9th Cir. 2000) (noting that the court's "review is confined to the BIA's decision and the bases upon which the BIA relied").  Here, in response to Plaintiffs' argument that their due process rights were violated, the BIA stated that "once apprised of the first wife's sworn statement, the petitioner could have asked the first wife to submit to cross-examination and could have provided that sworn statement to the Director." CAR1 at 4.  Plaintiffs urge that the Court may only evaluate the BIA's discrete point that Plaintiffs' due process rights were sufficiently protected because they had notice of Jaimes's statement and could have sought their own statement from her or asked her to sit for cross-examination themselves.  *See* Dkt. No. 22 at 13; Dkt. No. 26 at 6–7.

However, Plaintiffs' argument turns on an overly narrow view of what the BIA determined.  Despite Plaintiffs' suggestion otherwise, the BIA evaluated the scope of Plaintiffs' due process rights here, and determined that they did not require that the government make Jaimes available for cross-examination.  And, as Plaintiffs' own authorities make clear, the Court "review[s] de novo whether the BIA violated procedural due process in adjudicating an I-130 petition."  *See Zerezghi*, 955 F.3d at 807.  Aside from quoting *Chenery*, Plaintiffs make no effort to explain how it applies in this particular context where the Court does not defer to the agency. *Cf. Louis v. U.S. Dep't of Lab.*, 419 F.3d 970, 978 (9th Cir. 2005) (finding *Chenery* inapplicable where a court reviews agency action de novo).  It is not clear how the Court could conduct such a de novo review without considering the requirements of due process under *Ching* and *Mathews*. The Cour therefore rejects Plaintiffs' cursory argument under *Chenery*.

//

United States District Court
Northern District of California

### ii.   Prejudice

Before turning to the *Mathews* factors, Defendants suggest that Plaintiffs "may need to show prejudice." *See* Dkt. No. 24 at 15.  In *Ching*, the Ninth Circuit noted that "[t]he question of whether a plaintiff must demonstrate prejudice in the context of an I–130 visa petition is not settled." *Ching*, 725 F.3d at 1156.  The Ninth Circuit declined to decide the issue definitively because the petitioners there had demonstrated sufficient prejudice. *Id.*  The Court noted that "prejudice is shown if the violation *potentially* affects the outcome of the proceedings." *Id.* at 1156–57 (emphasis in original).  The Court found it sufficient that USCIS accepted the ex-husband's statement as true without the opportunity for cross-examination, and "in the face of contradictory documents and affidavits." *Id.* at 1156.  The Court cautioned that the right to cross-examine witnesses is particularly important "where the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy." *Id.* (quotation omitted).

Here, Defendants acknowledge that it is not clear whether Plaintiffs must show prejudice. *See* Dkt. No. 24 at 15–16.  They cite the language in *Ching* above, but provide no further analysis of the issue.  It is also thus not clear whether Defendants actually *believe* that Plaintiffs must show prejudice.  The Court should not have to intuit Defendants' position or make Defendants' arguments for them.  Still, to the extent the parties assume that Plaintiffs must show prejudice, their arguments turn on the nature of the other evidence in the record—particularly the BGC report. *Compare* Dkt. No. 24 at 15–16 and Dkt. No. 27 at 9–10, *with* Dkt. No. 26 at 8.  Their arguments appear to collapse into a single question:  whether, without Jaimes's admission of fraud, there remains substantial and probative evidence in the record supporting Defendants' conclusion that Hanan and Jaimes's marriage was fraudulently entered into for the purpose of evading the immigration laws.  The Court addresses this question more directly in Section III.B.iii and Section III.C below.

### iii.   *Mathews* Factors

#### a.  First Factor

In evaluating the *Mathews* factors, the Court first considers the private interests that are at

stake in adjudicating the I-130 without first providing Plaintiffs an opportunity to cross-examine Jaimes. *See Ching*, 725 F.3d at 1157 ("The first *Mathews* factor is an assessment of the private interest that will be affected by the official action"). In *Ching*, the Ninth Circuit reasoned that this factor favored the plaintiffs because (1) Ching faced removal from the United States without the I-130 approval; (2) "[t]he right to marry and to enjoy marriage are unquestionably liberty interests protected by the Due Process Clause"; and (3) "[t]he right to live with and not be separated from one's immediate family is a right that ranks high among the interests of the individual and that cannot be taken away without procedural due process." *Id.* (quotation omitted); *accord Zerezghi*, 955 F.3d at 810 (relying on *Ching*'s analysis to define the private interests at stake). In a similar case involving an I-130 petition, the Ninth Circuit explained that "being separated from one's spouse implicates strong private interests" under the first *Mathews* factor. *Yocom*, 2024 WL 2206342, at *2. Plaintiffs echo these concerns, stating that "Plaintiff Gillum will not be able to live [] in the United States with Plaintiff Hanan, the father of her child." *See* Dkt. No. 26 at 9. Although Hanan is not currently in removal proceedings, Plaintiffs further urge that without the I-130, "nothing prevent[s] the Department of Homeland Security from initiating proceedings in his case." *Id.*

The Supreme Court's recent decision in *Department of State v. Muñoz*, however, calls into question the nature of the private interests at stake here. 144 S. Ct. 1812, 1821 (2024). In *Muñoz*, Sandra Muñoz, a U.S. citizen, filed an I-130 petition for her husband, which was granted. *Id.* at 1818. Because her husband had entered the United States unlawfully, he was required to return to El Salvador and submit his visa application at a consulate there. *Id.* The consular officer ultimately denied the husband's visa application without explanation after finding that he was associated with the transnational gang MS-13. *Id.* at 1817. Her husband could not challenge the denial of his visa application, so Muñoz challenged it instead. *Id.* In doing so, she urged that "[t]he right to live with her noncitizen spouse in the United States is implicit in the 'liberty' protected by the Fifth Amendment," and that "the denial of her husband's visa deprived her of this interest, thereby triggering her right to due process." *Id.* She further argued that the consular officer had violated her right to due process by declining to disclose the reason for finding her

husband inadmissible.  *Id.*

In reversing the Ninth Circuit, the Supreme Court held "that a citizen does not have a fundamental liberty interest in her noncitizen spouse being admitted to the country."  *Id.* at 1821. The Court recognized that "Congress can use its authority over immigration to prioritize the unity of the immigrant family," and it does so by, for example, exempting "immediate relatives" from certain numerical quotas.  *Id.* at 1825.  But the Supreme Court explained that "the Constitution does not *require* this result."  *Id.* (emphasis in original).  The Court further explained:

> Congress's generosity with respect to spousal immigration has always been subject to restrictions, including bars on admissibility.  This is an area in which more than family unity is at play:  Other issues, including national security and foreign policy, matter too.  Thus, while Congress may show special solicitude to noncitizen spouses, such solicitude is a matter of legislative grace rather than fundamental right.

*Id.* (quotation omitted).

In light of *Muñoz*, the Court provided the parties with an opportunity to supplement their briefs and address the implications of *Muñoz* for Plaintiffs' appeal.  *See* Dkt. Nos. 32, 33. Defendants argue that the Supreme Court's decision in *Muñoz* undermines the Ninth Circuit's analysis in *Ching*.  *See* Dkt. No. 33 at 4–5.  Defendants point out that when considering the first *Mathews* factor, the Ninth Circuit in *Ching* explicitly assumed that petitioners had a right to "enjoy marriage" and "live with and not be separated from one's immediate family."  *See* Dkt. No. 33 at 4–5 (citing *Ching*, 725 F.3d at 1157).  Defendants suggest that *Muñoz* casts doubt on these assumptions, such that Plaintiffs' asserted interest in living together in the United States is thus less significant.  As the Supreme Court explained, inherent in an asserted right to reside with one's noncitizen spouse is the idea that a citizen has the right to have that spouse enter and remain in the United States.  *See Muñoz*, 144 S. Ct. at 1823.  The Supreme Court explained that such a purported right is inconsistent with "the Government's sovereign authority to set the terms governing the admission and exclusion of noncitizens."  *Id.*  Accordingly, Defendants contend that for purposes of the first *Mathews* factor, Plaintiffs' private interest is no more than an unprotected "desire" to live together in the United States.  *See* Dkt. No. 33 at 6.

18

1        For their part, Plaintiffs urge that an I-130 petition, and the underlying interests involved,

2  are different than those at issue in *Muñoz*.  *See* Dkt. No. 32 at 5–7.  Specifically, Plaintiffs argue

3  that because there is no discretion in the adjudication of an I-130 petition, Gillum has a *property*

4  *interest* in the approval of the petition.  *Id.*  This is different, they state, from a *liberty interest* in

5  residing with one's noncitizen spouse in the United States.  *Id.*  In *Muñoz*, the I-130 petition had

6  already been approved, and the case only involved the subsequent and discretionary denial of a

7  consular visa.  *Id.*

8        The Court acknowledges that in *Ching*, the Ninth Circuit held that the petitioners had a

9  property interest in the approval of the I-130 petition because "[w]here a petitioner of an

10  immediate relative petition proves that his marriage meets the requirements for the approval of an

11  I–130, he is entitled, as a matter of right, to the approval of his petition."  *Ching*, 725 F.3d at 1155.

12  Although the Court relied in part on the "protected liberty interest" that a U.S. citizen has in her

13  marriage to "buttress" this conclusion, the Court primarily looked to the language of 8 U.S.C.

14  § 1154 itself.  *Id.*  Consequently, *Muñoz* does not necessarily overrule *Ching* directly, and

15  Defendants do not argue that it does.  *See* Dkt. No. 33 at 4–6; *but see Kane v. U.S. Attorney*

16  *General*, No. 23-cv-14192, 2024 WL 3650239, at *7 (11th Cir. Aug. 5, 2024) (per curiam)

17  (rejecting due process claim in adjudication of I-130 petition in light of *Muñoz*).

18        The Ninth Circuit has cautioned that only in cases of "clear irreconcilability" can district

19  courts "consider themselves bound by the intervening higher authority and reject the prior opinion

20  of [the Ninth Circuit] as having been effectively overruled."  *Miller v. Gammie*, 335 F.3d 889,

21  899–900 (9th Cir. 2003) (en banc).  "This is a high standard," which "requires [the district court]

22  to look at more than the surface conclusions of the competing authority."  *Rodriguez v. AT & T*

23  *Mobility Servs. LLC*, 728 F.3d 975, 979 (9th Cir. 2013) (quotation omitted).  Given the different

24  procedural postures of *Ching* and *Muñoz*, the Court cannot say that the reasoning of *Ching* is

25  clearly irreconcilable with *Muñoz*.  Plaintiffs may have a property interest in the approval of an I-

26  130 while lacking a liberty interest in residing in the United States together.  The Court therefore

27  continues to conclude, as *Ching* found, that the grant of an I-130 petition is a "protected interest []

28  entitled to the protections of due process."  *Ching*, 725 F.3d at 1156.

1    But this does not end the inquiry.  The Court in *Ching* went on to evaluate what if any

2    additional process petitioners were due as a result of this property right.  *See id.* at 1157–59.

3    When evaluating the nature of the petitioners' private interest under the first *Mathews* factor, the

4    Court explicitly considered the risk of family separation.  *See Ching*, 725 F.3d at 1157 (noting that

5    "[t]he right to marry and to enjoy marriage are unquestionably liberty interests protected by the

6    Due Process Clause" and that "[t]he right to live with and not be separated from one's immediate

7    family is a right that ranks high among the interests of the individual and that cannot be taken

8    away without procedural due process").  *Muñoz* directly discussed these rights, finding that a

9    citizen does not have a fundamental liberty interest in residing with her noncitizen spouse in the

10   United States.  Consequently, Defendants contend that *Muñoz* requires the Court to "revisit the

11   private interests presumed in *Ching* and its progeny" under the first *Mathews* factor.  Dkt. No. 33

12   at 6.

13   Plaintiffs offer no response to this specific argument, and it is not clear post-*Muñoz* what if

14   anything is left of the private interests identified in *Ching*.  *See* Dkt. No. 32.  Their property right

15   in the approval of the I-130 only appears to have significance insofar as it allows Plaintiffs to live

16   together in the United States.  They state that "Plaintiff Gillum will not be able to live [] in the

17   United States with Plaintiff Hanan, the father of her child."  *See* Dkt. No. 26 at 9.  Having

18   reviewed Plaintiffs' briefs in detail, the Court concludes that they do not appear to identify any

19   interests distinct from their desire to live together in the United States.  Accordingly, the Court

20   agrees with Defendants that in light of *Muñoz*, Plaintiffs' private interests are appropriately

21   characterized as limited at best, such that the first *Mathews* factor does not clearly weigh in favor

22   of Plaintiffs.

23   **b.  Second Factor**

24   The Court next considers the risk of an erroneous finding that Hanan's marriage with

25   Jaimes was fraudulent against the probative value of making her available for cross-examination.

26   *See Ching*, 725 F.3d at 1157–58.  The Ninth Circuit in *Ching* explained that "the risk of an

27   erroneous finding that a prior marriage was fraudulent is high in cases where an ex-spouse is relied

28   upon for evidence that the previous marriage was fraudulent."  *Id.*  An ex-spouse may, for

United States District Court
Northern District of California

20

1    example, be "motivated by malice, vindictiveness, intolerance, prejudice, or jealousy." *Id.* at 1156

2    (quotation omitted).  Plaintiffs argue that these same risks exist here too.

3          Plaintiffs note that although they were given the opportunity to respond to Jaimes's

4    statement, they have no insight into the nature of Defendants' interactions with Jaimes, or whether

5    she felt intimidated or coerced into giving her statement as a result of Defendants' conduct.  *See*

6    Dkt. No. 22 at 13–14; Dkt. No. 26 at 8–9.  In their responses to the NOIDs, Hanan further

7    suggested that Jaimes was an unreliable witness because she abused alcohol while they were

8    together and she was "probably angry about the divorce" and Hanan's decision not to pay her

9    more during that process.  CAR2 at 125–27.  Plaintiffs suggest that they would have confronted

10   Jaimes with Hanan's own contentions that, for example, he introduced her to his family and asked

11   her to move to San Francisco with him.  *See* Dkt. No. 22 at 14.  In short, Plaintiffs say they missed

12   the opportunity to undermine Jaimes's credibility.

13         Such high-level credibility concerns are likely present in every case in which the

14   government relies on the statement of an ex-spouse.  But as noted above, in *Ching* the Ninth

15   Circuit did not create a categorial rule that cross-examination is always required in such

16   circumstances.  To the contrary, the court stated that the amount of process anyone is entitled to

17   depends on "the specific circumstances involved," and directed courts to evaluate such claims on a

18   "case by case basis."  *Ching*, 725 F.3d at 1157.

19         In *Ching*, the court found it significant that USCIS based its marriage-fraud determination

20   exclusively on the ex-husband's short statement notwithstanding the petitioner's substantial

21   evidence that the marriage was bona fide.  *Id.* at 1158.  In contrast to her ex-husband's "terse

22   statement," the petitioner provided "excruciating detail" in a 21-page, single-spaced document

23   about their intimate relationship, the conversations they had, and why the relationship eventually

24   deteriorated.  *Id.* at 1153.  The petitioner also provided corroborating documentation.  *Id.* at 1153,

25   1158.  For example, the ex-husband stated that they never lived together, but the petitioner

26   provided a lease agreement and joint utility bills.  *Id.* at 1153.  The ex-husband stated that he did

27   not marry the petitioner for love, but the petitioner proffered a letter her ex-husband had

28   previously written to USCIS stating that he and his ex-wife "truly loved each other."  *Id.*  The

United States District Court
Northern District of California

1    Ninth Circuit expressed concern that the BIA was willing to reject such detailed evidence based

2    solely on the ex-husband's conclusory say-so.  *Id.* at 1158.

3         Here, in contrast, Defendants did not rely solely on Jaimes's statement.  They also had a

4    contemporaneous report from a 2011 BGC interview with Hanan, which was conducted when he

5    was still married to Jaimes.  The report reflected Hanan's statement that a third party involved in

6    the slot machine scheme told him that "[w]e can help you stay here, like legally."  CAR1 at 72.

7    The report reflects that Hanan indicated that the person told him that he would arrange for Hanan

8    "to marry a U.S. citizen in order to get a green card."  *Id.*  According to the report, Hanan told

9    agents that this third party "found James [*sic*] and that he paid her to marry him."  *Id.*  Hanan had

10   her phone number, but did not know her birthdate.  *Id.*  Hanan said "he was told to pay James [*sic*]

11   $250.00 every month until he received his green card."  *Id.*  Hanan said he "would deposit money

12   directly in James' [sic] bank account."  *Id.*  Hanan acknowledged that "he recently filed for

13   divorce from James [*sic*]."  *Id.*

14        As discussed further in Section III.C below, it is clear that Plaintiffs believe Defendants

15   placed too much weight on this report and disagree with the conclusions that Defendants have

16   drawn from it.  But regardless, unlike in *Ching*, Defendants here had separate evidence reflecting

17   that Hanan acknowledged that his marriage to Jaimes was arranged for immigration purposes, that

18   someone else found Jaimes for him to marry, and that he paid her monthly as instructed.

19   Defendants provided Plaintiffs with a copy of the report that BGC had redacted to exclude the

20   names of the BGC agents and the alleged co-conspirators in the illegal slot machine ring.  *Id.* at

21   62–83.  And Plaintiffs do not appear to dispute that Hanan did in fact meet with BGC agents, or

22   that in the process of answering questions about an illegal slot machine distribution ring, he

23   discussed his relationship with Jaimes.  *See* Dkt. No. 22 at 3.  Notably, despite having multiple

24   opportunities and every incentive to do so, Hanan does not argue that the report inaccurately

25   reflects what he discussed during the BGC interview.  As discussed in more detail in Section III.C

26   below, Plaintiffs suggest that the report "contains no admission of marriage fraud," *see* Dkt. No.

27   22 at 17–18, but never assert that the report inaccurately captured his statements or that cross-

28   examining the agent who prepared it would reveal anything to undermine the substance of the

United States District Court
Northern District of California

report.

Hanan's proffered rebuttal evidence is also far less compelling than that offered in *Ching*, despite Plaintiffs having significant time to amass it.  Plaintiffs provided just 16 photographs of Hanan and Jaimes together from the course of their entire relationship, six of which were from the wedding, and a handful of one-page conclusory declarations.  Hanan, for his part, provided two short statements, neither of which provided any specific detail about the nature of his courtship of or marriage to Jaimes.  He simply asserted in conclusory fashion that he "was attracted to" Jaimes and  married her "with the intention to build a life together."  *See* CAR1 at 90.  Separately, he stated that he met Jaimes "through friends" and that they "spent some time together."  *See id.* at 125.  But he offered no detail about their introduction, what they did together, what they talked about, or how they intended to build a life together.  He offered similarly little detail about their married life together, such as whether they lived together or shared finances, or even saw each other outside of the wedding, honeymoon trip to Las Vegas, and a single visit from Hanan's family shortly after the wedding.

The three one-page declarations from Hanan's friends and family members similarly offer no insight into the nature of Hanan and Jaimes's relationship.  *See* CAR2 at 105–119.  Hanan's friend stated that he "was not in really close contact with [Hanan] all the time," but was invited to Hanan's wedding.  *Id.* at 119.  He concluded from his observations there that he "believed and understood" Hanan and Jaimes "were trying to start a life together."  *Id.*  He did not say what his observations were.  Hanan's uncle stated that the couple "looked happy" on a honeymoon trip to Las Vegas shortly after the wedding.  *See id.* at 116.  He said he "felt that this relationship [was] moving to [the] right direction," *id.*, but didn't explain why.  And Hanan's father visited Hanan and Jaimes once "a few months after their marriage" and had a "feeling" they were trying to start a life together.  *See id.* at 113.  Again, he offered no detail about the visit or the basis of his "feeling" about Hanan and Jaimes's intentions.

Such information does not come close to the level of rebuttal evidence provided in *Ching*.  Defendants' reliance on the BGC report and Plaintiffs' insufficient rebuttal evidence make the risk that Plaintiffs were erroneously deprived of their rights far lower here than it was in *Ching*. And

United States District Court
Northern District of California

23

because Defendants relied on information beyond Jaimes's statement, the Court finds it unlikely that cross-examining Jaimes would reduce the risk of an erroneous deprivation in this case. *Accord Alabed v. Crawford*, 691 F. App'x 430, 432 (9th Cir. 2017); *Graziani v. Barr*, No. CV 18-2420-CBM-SP(X), 2021 WL 822706, at *8 (C.D. Cal. Jan. 21, 2021), *aff'd sub nom. Graziani v. Whitaker*, No. 21-55190, 2021 WL 5850908 (9th Cir. Dec. 9, 2021).

### c.  Third Factor

Lastly, the Court considers the government's interest.  The Ninth Circuit has stated that "the government has a substantial interest in preventing marriage fraud and in avoiding erroneously providing benefits." *Ching*, 725 F.3d at 1158.  "On the other hand, there is a significant public interest in allowing those who are legitimately married to receive the benefits intended for them." *Id.* at 1158–59.  The Court must therefore consider the burden on the government in holding a hearing at which Plaintiffs could cross-examine Jaimes.  Defendants argue that this would unnecessarily burden the government when they had already provided Plaintiffs with the substance of Jaimes's statement. *See* Dkt. No. 24 at 18.  They allude to the financial and administrative burden this could cause, but Defendants offer little detail about the true cost of providing this additional process in this case.  In the absence of more specific information, the Court finds that the burden of holding an evidentiary hearing and making Jaimes available for cross-examination would be slight.

*          *          *

Having considered the parties' arguments in detail, the first two *Mathews* factors weigh against finding that Plaintiffs had a due process right to cross-examine Jaimes.  And only the third factor weighs in favor of Plaintiffs in this case.  On balance, the Court therefore finds that Plaintiffs did not have a due process right to cross-examine Jaimes under the circumstances.

### C.  Substantial Evidence

Even putting aside their due process concerns, Plaintiffs argue that the BIA's determination that Hanan and Jaimes's marriage was fraudulent and the marriage fraud bar applies was not supported by substantial and probative evidence. *See* Dkt. No. 22 at 15–20.  The Court reviews Defendants' determination that Hanan and Jaimes's marriage was fraudulent under the

United States District Court
Northern District of California

substantial evidence standard.[2]  *See Damon v. Ashcroft*, 360 F.3d 1084, 1088 (9th Cir. 2004)

("Whether [a beneficiary] entered into the qualifying marriage in good faith is an intrinsically fact-

specific question reviewed under the substantial evidence standard.").  The substantial evidence

standard "is an extremely lenient standard that asks courts to consider only whether the

administrative record contains sufficient evidence to support the agency's factual determinations."

*Zerezghi*, 955 F.3d at 814 (quotations and alterations omitted).  "In the immigration context, the

substantial-evidence standard means that a reviewing court must affirm the BIA's order when

there is such relevant evidence as reasonable minds might accept as adequate to support it, even if

it is possible to reach a contrary result on the basis of the evidence."  *Id.* at 814–15 (quotation

omitted).

As explained above, Defendants relied both on Jaimes's statement and the BGC report.

Plaintiffs offer a scattershot list of critiques of Defendants' evidence.  *See* Dkt. No. 22 at 15–17.

In her statement, Jaimes admitted that she was approached by a friend to marry Hanan for

money, and that Hanan paid her $1,500 to $2,000 for the marriage.  *See* CAR1 at 129.  She said

that they agreed that Hanan would pay her $500 a month, although she "sometimes asked for

more."  *See id.*  When Hanan asked her to move to San Francisco shortly after their wedding, she

said she didn't want to move and didn't want to help him anymore.  *Id.*  Jaimes summarized their

marriage by saying its "whole purpose" was for Hanan "to get his papers and for me to get extra

cash."  *Id.*  The Court has already explained that Plaintiffs were not entitled to cross-examine

Jaimes.  *See* Section III.B.  Plaintiffs also suggest that Jaimes's statement lacks credibility and

internal consistency.  Specifically, Plaintiffs point out that Hanan asking Jaimes to move to San

Francisco is not consistent with Jaimes's assertion that the marriage was a sham.  But it is not for

the Court to reweigh the evidence and substitute its opinions and credibility determinations for

those of the agency.  "The agency's findings of fact are conclusive unless any reasonable

---

[2] The government must prove marriage fraud by "substantial and probative evidence," a standard that is "at least as high as a preponderance of the evidence."  *See* 8 C.F.R. § 204.2(a)(1)(ii); *Zerezghi*, 955 F.3d at 816.  Once the government has found substantial and probative evidence of marriage fraud, the burden then shifts to the petitioners to rebut that finding.  *See Zerezghi*, 955 F.3d at 805.  This standard of *proof* is distinct from the Court's standard of *review*.  *Id.* at 813–16.

United States District Court
Northern District of California

adjudicator would be compelled to conclude to the contrary." *Iman v. Barr*, 972 F.3d 1058, 1064 (9th Cir. 2020).  It is equally plausible, as Defendants assert, that Hanan asked her to move to continue the fraud until he could apply for immigration benefits.  *See* Dkt. No. 24 at 17–18.

As to the BGC report, Plaintiffs state that the report, although created by law enforcement as part of an investigation, lacks indicia of reliability.  Plaintiffs argue:

- The report is not a "sworn statement" from Hanan admitting to engaging in marriage fraud.  *See* Dkt. No. 22 at 17.  However, Plaintiffs offer no authorities to support the suggestion that evidence may only support a finding of marriage fraud if it constitutes a sworn statement.

- The report was redacted in part, suggesting that Defendants did not provide them with a complete administrative record.  *See* Dkt. No. 26 at 12–13; *see Zerezghi*, 955 F.3d at 813 ("Given the harsh effects of a marriage-fraud determination, [petitioners] are entitled to at least the complete administrative record on which USCIS and the BIA relied in reaching its determinations . . . .").  But the record makes clear that BGC—not Defendants—redacted the report.  *See* CAR1 at 68–79.  And USCIS said that it "ha[d] not relied on any evidence that is redacted in determining that the beneficiary engaged in marriage fraud."  *Id.* at 66.

- Jaimes's name is misspelled as "James," and Hanan's description of the financial contributions he provided to Jaimes are not identical to the amounts of money Jaimes said he paid her.  *Id.*  The misspelling is unsurprising since the report was dictated from a live interview, and "James" is a common spelling.  And both Hanan in the report and Jaimes in her statement appear to provide just approximations of the amount Hanan paid her.  Such minor differences do not undercut the agency's reliance on the report.

- Plaintiffs also take issue with the agent's name being redacted in the report.  *See* Dkt. No. 22 at 17.  But Plaintiffs do not explain how this undercuts the reliability of the report.  To the extent Plaintiffs now suggest that they should have had an opportunity to cross-examine the agent who prepared the report too, *see* Dkt. No.

22 at 18, they do not offer any explanation as to what probative value this additional process would have had.[3]  Plaintiffs do not dispute that Hanan actually interviewed with BGC as part of its investigation.  Nor do they propose a reason why the agent who was investigating illegal slot machines had any reason to misstate anything in the report—let alone such ancillary details about Hanan's marriage to Jaimes.  In fact, and perhaps most significantly, Plaintiffs do not assert that the agent inaccurately recounted Hanan's statements from the interview at all.  Jaimes's statement and the BGC report constituted substantial and probative evidence of a conspiracy to commit marriage fraud.

Plaintiffs nevertheless assert that the BIA did not properly identify and apply the burden-shifting framework.  *See* Dkt. No. 22 at 18.  But the BIA directly concluded that there was "substantial and probative evidence" of marriage fraud "in the present case and present in the record of proceedings."  *See* CAR1 at 4.  The BIA identified both Jaimes' statement and Hanan's statements in the BGC report.  *See id.*  The BIA further concluded that in response "the petitioner submitted insufficient evidence to establish that the beneficiary's first marriage was bona fide."  *Id.*  The record therefore reflects that the BIA correctly applied the relevant framework.  The Court further notes that the BIA expressly "agree[d]" with USCIS's decision that Plaintiffs' proffered evidence was insufficient to overcome the evidence of marriage fraud, meaning that the Court may also look to the underlying USCIS decision.  *Salazar-Paucar v. I.N.S.,* 281 F.3d 1069, 1073 (9th Cir.), *opinion amended on denial of reh'g*, 290 F.3d 964 (9th Cir. 2002) ("When the BIA conducts a de novo review of the IJ's decision, as here, we review the BIA's decision rather than the IJ's, except to the extent that the BIA expressly adopts the IJ's ruling.").  USCIS similarly noted the burden-shifting framework, found substantial and probative evidence of marriage fraud, and

---

[3] The Court notes that Plaintiffs only raise the purported need to cross-examine the agent in a single sentence as part of their argument why the government does not have substantial and probative evidence.  *See* Dkt. No. 22 at 17–18.  They state:  "[T]he redaction's failure to identify the review officer leaves Plaintiffs without the notice that is required under *Zerezghi*, and unable to subject the declarant to cross-examination under *Ching*."  *Id.* at 18.  To the extent Plaintiffs intended to raise a due process argument as to the BGC report, it should not have been buried in an entirely different section of their brief without meaningful discussion.

United States District Court
Northern District of California

1    explained why Plaintiffs' evidence was unpersuasive and insufficient in response.  *See* CAR1 at

2    50–53.  The Court is unpersuaded by Plaintiffs' suggestion that Defendants had to use some

3    specific phrasing in adopting USCIS's ruling and discussing the burden-shifting framework.  *See*

4    Dkt. No. 26 at 13.

5          Finally, to the extent Plaintiffs suggest that the BIA failed to consider their contrary

6    evidence, *see* Dkt. No. 22 at 18, this simply is not true.  Defendants clearly considered the

7    evidence offered to rebut the sham marriage showing, but determined it was insufficient, in both

8    quantity and quality, to carry their burden of proof.  Although the BIA did not reference specific

9    pieces of evidence, the decision reflects that the BIA "agree[d]" with the USCIS Field Office

10   Director and noted that Gillum had not submitted "evidence of joint residency, joint ownership of

11   property, or commingling of finances."  *See* CAR1 at 3.  As discussed above, there was an amply

12   reasonable basis for Defendants to discount the high-level statements provided by Hanan and his

13   friends and family, and the handful of photographs.  In short, Defendants weighed all the evidence

14   presented and reasonably concluded that Plaintiffs did not overcome the probative value of

15   Jaimes's statement and the BGC report, in which both Hanan and Jaimes discussed a conspiracy to

16   commit marriage fraud by marrying each other in exchange for money so Hanan could receive

17   immigration benefits.  The substantial and probative evidence of marriage fraud in the record,

18   which Plaintiffs failed to sufficiently rebut, demonstrates that Defendants' application of the

19   marriage-fraud bar was not arbitrary, capricious, an abuse of discretion, or otherwise contrary to

20   law.  The BIA decision reflects careful consideration of all relevant factors, as well as Plaintiffs'

21   arguments on appeal.

22   **IV.    MOTION TO SEAL**

23         **A.    Legal Standard**

24         Courts generally apply a "compelling reasons" standard when considering motions to seal

25   documents.  *Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 678 (9th Cir. 2010) (quoting *Kamakana*

26   *v. City & Cty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006)).  "This standard derives from the

27   common law right 'to inspect and copy public records and documents, including judicial records

28   and documents.'"  *Id.* (quoting *Kamakana*, 447 F.3d at 1178).  "[A] strong presumption in favor of

United States District Court
Northern District of California

access is the starting point." *Kamakana*, 447 F.3d at 1178 (quotations omitted).  To overcome this strong presumption, the party seeking to seal a judicial record attached to a dispositive motion must "articulate compelling reasons supported by specific factual findings that outweigh the general history of access and the public policies favoring disclosure, such as the public interest in understanding the judicial process" and "significant public events." *Id.* at 1178–79 (quotations omitted).  "In general, 'compelling reasons' sufficient to outweigh the public's interest in disclosure and justify sealing court records exist when such 'court files might have become a vehicle for improper purposes,' such as the use of records to gratify private spite, promote public scandal, circulate libelous statements, or release trade secrets." *Id.* at 1179 (quoting *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978)).  "The mere fact that the production of records may lead to a litigant's embarrassment, incrimination, or exposure to further litigation will not, without more, compel the court to seal its records." *Id.*

The Court must "balance[] the competing interests of the public and the party who seeks to keep certain judicial records secret.  After considering these interests, if the court decides to seal certain judicial records, it must base its decision on a compelling reason and articulate the factual basis for its ruling, without relying on hypothesis or conjecture." *Id.*  Civil Local Rule 79-5 supplements the compelling reasons standard set forth in *Kamakana*:  the party seeking to file a document or portions of it under seal "must explore all reasonable alternatives to filing documents under seal, minimize the number of documents filed under seal, and avoid wherever possible sealing entire documents . . . ." Civil L.R. 79-5(a).  The party must further explain the interests that warrant sealing, the injury that will result if sealing is declined, and why a less restrictive alternative to sealing is not sufficient.  *See* Civil L.R. 79-5(c).

Records attached to nondispositive motions must meet the lower "good cause" standard of Rule 26(c) of the Federal Rules of Civil Procedure, as such records "are often unrelated, or only tangentially related, to the underlying cause of action." *See Kamakana*, 447 F.3d at 1179–80 (quotations omitted).  This requires a "particularized showing" that "specific prejudice or harm will result" if the information is disclosed. *Phillips ex rel. Estates of Byrd v. Gen. Motors Corp.*, 307 F.3d 1206, 1210–11 (9th Cir. 2002); *see also* Fed. R. Civ. P. 26(c).  "Broad allegations of

United States District Court
Northern District of California

harm, unsubstantiated by specific examples of articulated reasoning" will not suffice. *Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 476 (9th Cir. 1992) (quotation omitted).

**B.    Discussion**

The parties have jointly sought to file under seal the certified administrative record in this case in its entirety. *See* Dkt. No. 19. Because these records are more than tangentially related to the underlying action, the Court applies the "compelling reasons" standard.

The parties state that the administrative record contains "third party confidential information that is protected from public disclosure by the Privacy Act of 1974, 5 U.S.C. § 552a," as well as "sensitive personal and financial information." Dkt. No. 19-1 at ¶ 3. Having reviewed the administrative record in detail, however, it is not apparent why it needs to be sealed in its entirety. Although the record contains some personally identifying information and third party information, the parties have not explained why such information cannot be redacted in part. On the other hand, the record contains information that is critical to understanding this case, including the USCIS and BIA's decisions and Plaintiffs' responses. The Court further notes that the parties quote heavily from these documents, so it is clear that the parties do not believe that *everything* in the record warrants sealing. The parties have failed to meet their burden of establishing that compelling reasons require the certified administrative record to be sealed in its entirety, and the Court therefore **DENIES** the motion. Dkt. No. 19.

**V.    CONCLUSION**

Accordingly, the Court **DENIES** Plaintiffs' motion for summary judgment, Dkt. No. 22, and **GRANTS** Defendants' cross-motion, Dkt. No. 24. The Court further **DENIES** the motion to seal. Dkt. No. 19. The Court **DIRECTS** the parties to file public versions of all documents previously filed under seal or file a new, more narrowed motion to seal, within seven days of this order. The Clerk is directed to enter judgment in favor of Defendants and close the case.

**IT IS SO ORDERED.**

Dated:    9/25/2024

HAYWOOD S. GILLIAM, JR.
United States District Judge

30